**Walter K. POLSTORFF, Plaintiff,**

v.

**James C. FLETCHER, in his representative capacity as Administrator for National Aeronautics and Space Administration, an agency of the United States Government, Defendant.**

**Helmut G. KRAUSE, Plaintiff,**

v.

**James C. FLETCHER, in his representative capacity as Administrator for National Aeronautics and Space Administration, an agency of the United States Government, Defendant.**

**Civ. A. Nos. 76–G–0728–NE, 76–G–1422–NE.**

United States District Court, N. D. Alabama, Northeastern Division.

March 10, 1978.

As Amended June 12, 1978.

Dieter J. Schrader, Huntsville, Ala., for plaintiff.

J. R. Brooks, U. S. Atty., and Caryl P. Privett, Asst. U. S. Atty., Birmingham, Ala., for defendant.

## AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

GUIN, District Judge.

The Findings of Fact and Conclusions of Law heretofore filed in the above-styled consolidated cases on March 10, 1978, are hereby amended by the following:

## FINDINGS OF FACT

This action was brought pursuant to Title VII of the Civil Rights Act of 1964, as amended (1972), 42 U.S.C. §§ 2000e *et seq.*, alleging discrimination on the basis of national origin, and pursuant to the Age Discrimination in Employment Act of 1967, as amended (1974), 29 U.S.C. §§ 621 *et seq.* At the close of plaintiffs' case, all allegations and claims raised under Title VII were dismissed, with prejudice, upon plaintiffs' motion. Thus, the only issues before the court are whether plaintiffs were discriminated against on the basis of age in the reduction-in-force (RIF)/reorganization of 1974 at Marshall Space Flight Center (MSFC) of the National Aeronautics and Space Administration (NASA).

Marshall Space Flight Center was required to reduce its manpower by approximately 350 by reason of budget cuts and personnel ceilings prescribed by Congress and the Office of Management and Budget. Dr. Roco Petrone, Director of MSFC (at that time) determined that in order to prepare for the future, a center-wide reorganization was necessary, and he decided to have the reorganization coincide with the reduction-in-force. Reduction-in-force procedures were applied in order to reduce manpower pursuant to Civil Service Commission regulations. These procedures include displacement ("bumping" and "retreat") rights. The reorganization of the center was carried out by abolishing all jobs and creating new ones.

## POLSTORFF

Before the 1974 RIF/reorganization, plaintiff Polstorff held the position of Chief, Computer Systems and Simulation Division in MSFC's Science and Engineering Directorate (S&E) with a grade GS–15/8. The functions of this division were primarily transferred to the Simulation Division, a division of the newly created Systems Dynamics Laboratory. The RIF resulted in a change of positions for plaintiff Polstorff, then age 62. He was downgraded to the position of a mathematician in the newly created Simulation Division with a grade of GS–13/10.

The reorganization was carried out by proposing candidates to fill the top level slots, and they, in turn, proposed the organization of their proposed areas of authority.

The principal participants in planning the reorganization for the Systems Dynamics Laboratory and its subordinate divisions and branches as such planning affected Polstorff were Dr. Judson Lovingood, who was to become the laboratory's director, Mr. Jack Lucas, who was to become the Chief of the Simulation Division, and Mr. Ray Lawrence, who was to become the Assistant Chief of the Simulation Division and the "Acting" Chief of the Simulation Systems Branch.

Polstorff was the only principal of the old Computer Systems and Simulation Division, and he was not advised of the reorganization.

Lovingood stated that it was his opinion that Lawrence and Lucas would be better candidates for supervisory positions than Polstorff because of Polstorff's hearing problem, and that Polstorff "possibly as a result of this, has some difficulty with his speech." Polstorff was tested on his hearing in open court, and the court acknowledged then that he could hear well and now so finds. Moreover, Polstorff testified that he has never had a problem with his speech, and his manner of speaking during the several hours of testimony was entirely acceptable.

Polstorff's former deputy, Ray Lawrence, a younger man, remained a GS–14 after the 1974 RIF. He was Polstorff's deputy at the very time he was engaged in planning the reorganization, the planning of which was kept by all concerned secret from Polstorff.

Polstorff was proposed for a "new," GS–15 slot, which however, would take him out of management and place him in a staff (advisory) job which was already vulnerable to abolition because of a then current policy to eliminate these staff positions. Polstorff was bumped from this slot by a veteran and would have been separated were it not for the fact that due to attrition a new slot at the GS–13 level was available for Polstorff to retreat into. This GS–15 staff position which Lucas stated he wrote with Polstorff in mind was indeed abolished in February 1975, with minimum impact. The participants in planning this reorganization were fully aware that this position could not last and this was simply a means of firing plaintiff Polstorff on a delayed basis rather than immediately. This position, which Dr. James Morelock was able to bump Polstorff from, delineated and described duties and responsibilities necessitating a strong engineering background. Morelock had no engineering background and was strictly a mathematician. Since Morelock did not fit the job description, he should not have been allowed to bump Polstorff. When this position was eliminated Morelock then attempted to bump Dr. Robert Seitz, but Morelock was declared not eligible for Seitz's position despite the fact that Seitz was Polstorff's former subordinate.

Lawrence's position as Assistant Chief, Simulation Division, also required a broad engineering background; yet Lawrence's background, other than the experience he gained under Polstorff's supervision, was also in mathematics.

Polstorff is an expert in computer systems and MSFC's role in computer systems actually increased as a result of the reorganization, substantially enough to form the Data Systems Laboratory. Duties and responsibilities delineated in various job descriptions indicate that Polstorff was qualified for several positions created by the reorganization, such as the GS–15 position of Assistant Chief, Simulation Division (encumbered by Lawrence), the grade GS–15 position of Deputy Chief, Data Systems Laboratory, and the grade GS–15 position of Chief, Applications Systems Division; all of which positions are encumbered by younger men (ages 41 to 45). Subsequent to the reorganization in late 1974, Polstorff was rated among the "best" qualified for such positions, but was not accorded an interview and not selected, notwithstanding regulations which accord preference to eligibles for promotion.

As a result of Lawrence being assigned to Bremen, Germany, on July 27, 1977, the position of Assistant Chief, Simulation Division, became open but had not been announced by Lucas (Chief of the Simulation Division) as a vacancy as of the date of this trial. Polstorff made two attempts to encourage Lucas to allow him to encumber this position as well as to allow him to encumber another vacant position—grade GS–14 position of Chief, Simulation Systems Branch, which Lawrence also encumbered. No justification has been offered for this refusal to allow Polstorff to encumber either or both of these two positions. Lucas is presently assuming the duties and responsibilities of three supervisory positions, including the two mentioned immediately above.

Mr. John Lynn, a nonveteran who was 41 years of age during the reorganization, who initially encumbered the grade GS–15 position of Chief, Application Systems Division, and is presently the Director of the Computer Service Office, acknowledged that Polstorff was rated as one of the "best" qualified but was not selected because his supervisory experience was primarily in the analog/hybrid simulation area and he had no experience in administration/business type computation which constitutes a major part of the computer work load. In fact, Polstorff had supervised the Digital Simulation Section since 1965. This position—of Chief, Application Systems Division—was given to a former subordinate of Pol-

storff's, Mr. Bobby Hodges, who had no prior experience in administration/business type computation.

With respect to Lawrence's two former positions, which he vacated when assigned by MSFC to Bremen, Germany, in July 1977, Lucas stated that he was not familiar with Polstorff's supervisory qualities; yet he acknowledged that he recently (during 1977) rated Polstorff very highly on his supervisory potential.

Mr. Howell Riggs, Director of Manpower during the reorganization, stated only that Civil Service Commission regulations were applied during the RIF and that Mr. Frank Bynum supervised a team of several position classification specialists in order to evaluate qualifications. Bynum was unable to identify the principal reasons for the decisions to downgrade Polstorff and to separate Dr. Helmut G. Krause, and he was unable to rebut either Polstorff or Krause concerning their in-depth evaluations of their qualifications for the several positions for which they maintained they were qualified. While Bynum stated the only reason that Polstorff was downgraded was because of the application of the RIF procedures, Lovingood stated the reason to be his (Polstorff's) hearing problem, which the court finds does not exist. Neither of these attempted justifications satisfies the court that there was any reason other than age for Polstorff's downgrading.

## KRAUSE

Dr. Helmut Krause, who was 62 years of age at the time of the reorganization, was separated from his grade GS–14 position as a member of the staff to the Director, Aero-astrodynamics Laboratory. The grade of GS–14 was the lowest grade that Krause had held; thus he had no retreat rights.

The reorganization had resulted in the abolition of all positions and the creation of new ones. Krause provided authoritative testimony concerning his qualifications for seven positions. He described the duties and responsibilities delineated in these position descriptions, stated that he was famil-iar with the same and that he was qualified to perform the functions described, and then correlated these duties and responsibilities to his own personal background in terms of education and experience and stated that he had the requisite background to perform in either or all of these positions. The court finds that Dr. Krause's evaluation of his own qualifications is correct.

Krause's main field of specialization was in "trajectory" and this function was in whole transferred to the Systems Integration Laboratory; yet Krause did not receive notification for job interviews there.

A majority of those in the Laboratory (before reorganization) were men of older age and were all of grade GS–15 or above. Of five assistants to the former director of the Aero-astrodynamics Laboratory, Dr. Ernst Geissler, only two—one in his early 40's (Jandebeur) and the other in his late 30's or early 40's (Murphree)—were retained; and the other three, Sperling, Krause, and Fritz Krause, were separated.

Mr. Werner Dahm, Chief, Aerophysics Division of the Systems Dynamics Laboratory of S&E, acknowledged that he did not recommend anyone other than the three employees who had previously worked under his direct supervision for the positions that called for experience in aerodynamics—namely, McAnally, Dunn and Anderson, all men in their early 40's or late 30's—and that no manpower personnel or job classification specialists asked him to make a comparison of qualifications between the encumbents of either of these seven positions with Krause.

Dr. Geissler (formerly the Director, Aero-astrodynamics Laboratory of S&E, now retired) identified numerous and lengthy titles of publications which involved aerodynamics authored by Krause and stated that several of Krause's 31 publications involved aerodynamics and an understanding of the same by the author. Geissler stated that during November 1973, Krause submitted his written theory entitled "Calculation of Stability Derivatives for Bodies of Revolution and Hypersonic Flight" and that a Mr.

Reed, former Chief of the Unsteady Aerodynamics Branch, reviewed the same and stated that it was the most complete theory that he had ever seen.

Krause, after having rated by the United States Civil Service Commission on September 9, 1965, received the following numerical scores for the following grade GS–15 fields of specialization: Space Sciences (98), Fluid and Flight Mechanics (96), Flight Mechanics (96), Heat Transfer (94). Testimony disclosed that it is perhaps not unusual for an employee to receive a rating of 90 or more in a single specialty but that it is unheard of for an employee to have such capabilities and competence that he receives near perfect ratings in four such scientific areas, at least one of which involves a profound knowledge and understanding of aerodynamics.

## STATISTICAL FINDINGS

Polstorff testified and the court finds that immediately subsequent to the reorganization there were 30 employees, including eight nonveterans between grades GS–14 and GS–15, who were reassigned to NCC–735 category from other NASA classification code positions, and that he held positions in NCC–735 category for ten years. His unrefuted testimony further disclosed that he studied sample position descriptions of the nonveterans so reassigned and found no drastic changes in duties and that all nonveterans were below 44 years of age.

The court finds that the overwhelming percentage of MSFC employees in NCC–700/200 Series (scientists and engineers) are between 30 and 54 years of age; and as of June 30, 1974—immediately subsequent to the reorganization—there were only 79 employees below 30 years of age, and only 125 employees above 54 years of age.

According to the *Characteristics of the Federal Executive*, published during November 1969 by the United States Civil Service Commission, Bureau of Executive Manpower, only 12.5 percent of S&E's executives at MSFC were 55 years and above; whereas 39 percent of all such executives are 55 years of age and above, according to *Executive Manpower in the Federal Government*, published during September 1975, and citing 1974 statistics.

Thirty percent of all nonveterans 55 years of age and above were adversely affected by the RIF during the 1974 reorganization, whereas only 3.5 percent of all nonveterans below 55 years of age were adversely affected.

The total employment of nonveterans in grades GS–13 and above at MSFC immediately subsequent to the reorganization was 522, with 47 (9 percent) 55 years of age and above, and 475 (91 percent) below 55.

Fifteen percent of all nonveterans at MSFC with grades GS–13 and above who were 55 years of age and above were downgraded, and 15 percent were separated; whereas only 2.5 percent below 55 years of age were downgraded, and only one percent below 55 years of age were separated.

■ These statistics alone are sufficient to support the court's finding of age discrimination. *Hodgson v. First Federal Savings and Loan Association of Broward County, Florida*, 455 F.2d 818 (5th Cir. 1972).

## ADDITIONAL FACTUAL BACKGROUND

Evidence of actions evincing a discriminatory animus is relevant to NASA's management's intent at the time the RIF was implemented, whether such actions occurred before or after the RIF. The court finds that an attitude of concern for NASA's younger employees existed during the reorganization of 1974, as documented by the following:

The minutes of the February 21 and 22, 1973, meeting of NASA's Personnel Management Review Committee (PMRC) state that it is management's opinion that promotions and new hiring are important enough to over-RIF if necessary to make it possible to have at least a few promotions and new hires each year; that the important years for even the best people are 10–15 years out

of college; and that the existence of RIF procedures has a detrimental effect in that young people look ahead, recognize their vulnerability, and leave.

An attachment to the June 12, 1973, minutes of NASA's PMRC meeting states recommendations by NASA's Committee on Youth and specifically calls for actions intended to separate "older" employees by recommending that the aging trend be reversed.

Defendant Fletcher testified at the NASA Authorization Hearings before the Committee on Science and Astronautics of the United States House of Representatives of March 21, 1974, and stated:

. . . (O)n the institutional side NASA's Civil Service employment will be stabilized at the end of fiscal year 1974 levels except for a further reduction of about 350 at the Marshall Space Flight Center at Huntsville, Alabama, related to the completion of the Skylab program. Stabilization of our Civil Service employment will be extremely beneficial to NASA. It will permit us to take advantage of normal turnover to employ more young people on whom the vitality of NASA depends . . . . .

A memorandum from E. S. Groo, NASA's Associate Administrator for Center Operations, to all of NASA's center directors, dated January 28, 1975, requested that employees with promotion potential be identified by April 11, 1975, and that the ages of the same should preferably be within the ages of 28 to 40.

A memorandum dated March 28, 1975, from Jack Swearingen, Associate Director for Management of S&E, to the laboratory chiefs also requests that employees with promotion potential be identified and that they should not be over 40.

Jack Swearingen issued a memorandum of retraction on April 8, 1975, to the laboratory chiefs, essentially stating that the age restriction of his March 28 memorandum be disregarded.

The court finds from all this evidence a clear inference as to the state of mind existing among the decision makers at the time of the RIF/reorganization concerning the protection of younger employees at the expense of older employees.

## CONCLUSIONS OF LAW

■ The Age Discrimination in Employment Act (ADEA) provides protection for persons between the ages of 40 and 65. The purpose of the ADEA was to alleviate serious economic and psychological suffering of persons within this age range, caused by unreasonable prejudice and job discrimination. *See*, 29 U.S.C. §§ 621, 631; U.S. Code Cong. & Admin.News 1967, p. 2213, Cong.Rec. Nov. 6, Dec. 4, 1967; *Brennan v. Paragon et al.*, 356 F.Supp. 286 (S.D.N.Y. 1976). The Act was amended in 1974 to provide the same protection to federal employees previously afforded to employees in the private sector.

It is a well-recognized principle today that *McDonnell-Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), although not establishing an immutable definition of a prima facie case, does serve as a precedent for ADEA and Title VII cases. This case must, of course, be resolved on the principles and rules of law heretofore accepted by the courts in dealing with Title VII and ADEA cases.

■ *Marshall v. Goodyear Tire and Rubber Co.*, 554 F.2d 730 (5th Cir. 1977), sets forth four elements that parallel the *McDonnell-Douglas* criteria and, if established, constitute a prima facie case of discrimination: the employee (1) is a member of the protected group, (2) was discharged, (3) was replaced with a person outside the protected group, and (4) is able to do the job. In reliance on *McDonnell-Douglas* and *Marshall*, and citing *Price v. Maryland Casualty Company*, 561 F.2d 609 (5th Cir. 1977), the government urges this court to find that plaintiffs have not established the third element of the criteria and thus have not established a prima facie case. In *Price v. Maryland Casualty Company* plaintiff, relying on the *McDonnell-Douglas* and *Marshall* approach, was unsuccessful due to a

failure to establish the third element. Defendant herein argues that plaintiffs must show replacement with a person *under 40*, since the "protected group" is those aged 40–65. However, in *Price* the Fifth Circuit cited as support *Marshall v. Goodyear.* In *Marshall v. Goodyear* the Fifth Circuit stated that "*McDonnell-Douglas* does not establish an immutable definition of a prima facie case."; and noted that the court in *McDonnell-Douglas* stated: " '[t]he facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required . . . is not necessarily applicable in every respect to differing factual situations.' " Since the Fifth Circuit has stated that *McDonnell-Douglas* does not establish an immutable definition of a prima facie case, plaintiffs are not restricted to the mechanical approach advocated by defendant, and the court may and does find from all the evidence that Polstorff and Krause were discriminated against by reason of age in violation of ADEA.

In the instant case, the plaintiffs have not necessarily made an effort to show that preference was given to members outside of the protected group, but the court finds that it would be impossible to replace either of these plaintiffs with people younger than the age of 40, under normal circumstances, due to the vast amount of education, training and experience necessary to encumber these positions. There is evidence that some people who were under 40 years of age were given preference over either of the plaintiffs; as for example, Dr. Rowland Burns, Krause's former subordinate, who was under the age of 40, was allowed to encumber a GS–13 position for which Krause was qualified. However, primarily the thrust of the case has been to show that "younger" people were given preference, and not necessarily people younger than 40 years of age. The ADEA protects individuals from age discrimination. A 62-year-old is entitled to protection against being replaced by a 42-year-old if the only factor is age. There is no "protected group" in exactly the same sense as in sex, race or similar cases, although there is a "protected group" in a somewhat different sense.

The court finds that the reason these preferred younger employees were able to qualify for these positions was that MSFC's function changed from the complex Apollo program prior to the reorganization of 1974 to the far less sophisticated shuttle flight program subsequent to the reorganization. Dr. Petrone stated that these types of people (i. e., Polstorff and Krause) would not have been reached for separation or reduction or downgrading during 1961 if NASA had had a similar reorganization during 1961, when it first launched its Apollo program. The court finds that MSFC discriminated against older employees in favor of younger employees, and that the tenor of this discrimination during the reorganization of 1974 was set during 1973 by NASA's overall concern for its younger employees, and was proved by its pampering of its younger employees ("upon whom the vitality of NASA depends") because, due to its changing function, NASA was in a position to do so.

■ NASA was justifiably concerned with the viability and future of the agency and at this time was faced with ordered cut-backs in budget and personnel as well as diminished duties and functions. However, this RIF must comply with the laws and regulations established by Congress and the Civil Service Commission. The ADEA does not allow NASA to discriminate against its older employees so long as they are qualified to perform the duties and responsibilities incident to NASA's functions at the present time.

■ The plaintiffs urge on the court a finding that both management and Manpower (through their application of RIF procedures) discriminated against plaintiffs on the basis of age, though not in concert and without conspiring. The court finds, however, the indicia of a conspiracy. The defendant's witnesses testified that once they had proposed certain candidates and turned these plans over to the Manpower Office to verify qualifications of proposed candidates and apply RIF procedures to the plans, numerous dry runs were made to

determine the effects the RIF would have on the capabilities of the center before the final 1974 RIF/reorganization was accomplished. The court finds the multiple dry runs to be a significant factor in determining that this was not a perfectly age-neutral decision. Job descriptions were rewritten to "cover in" the younger favored employees until, finally, the dry runs produced the "right" employees who would escape termination or downgrading.

The court finds that age was the motivating factor in the downgrading of Polstorff and the separation of Krause. There can be no doubt that it was one factor. *Laugesen v. Anaconda Co.*, 510 F.2d 307 (6th Cir. 1975), held even if more than one factor (age being one factor) affected the decision to discharge plaintiff, plaintiff could recover.

The court finds that the reduction of plaintiff Polstorff was the result of age discrimination; that plaintiff Polstorff was qualified; that he had very high efficiency ratings; and that he possessed the requisite education, training, and experience to encumber several of the positions created during the 1974 RIF/reorganization.

The court finds that NASA ignored plaintiff Krause's brilliance, his unique ability and credentials, his rich background of experience, and his very high ratings, and did not consider him for positions for which he was well qualified and which were filled during the 1974 RIF/reorganization; and that Krause was not considered for these positions because of his age.

### RELIEF

■ Polstorff is qualified for either of the GS–15 positions presently encumbered by Lucas. He shall, therefore, be offered one of these positions, or another GS–15 position available at MSFC for which he is qualified, and shall be awarded back pay equal to the difference in compensation he has received as a GS–13 since the RIF/reorganization and that which he would have received had he encumbered a GS–15 position during this interval. Polstorff shall be accorded the same seniority rights as he would have acquired had he encumbered a GS–15 position at all times since the RIF/reorganization.

Krause shall be offered a GS–14 position in one of the four fields for which he is qualified, and all back pay and seniority rights which would have accrued to him had he encumbered a GS–14 position at all times since the 1974 RIF/reorganization.